Our next case is PMCFilm Canada v. Shintech. Good morning, Your Honor. May it please the Court, I'd like to initially reserve three minutes of rebuttal. My name is Francis J. Sullivan, along with my colleague Jeffrey D'Amico. We represent TMC Canada. This case is before the Court on the basis of a diversity of jurisdiction, and it involves the interpretation of the price provisions of a non-ambiguous fully integrated contract pursuant to Texas law. It involves a situation between two companies in connection with the purchase of PVC resin based upon a contract which required the one party, my client, to purchase 100% of their supply needs from Shintech. I think we know the facts pretty well. Is the hard fill that's produced this stuff that I have so much trouble getting out to do? Exactly, exactly. That is exactly what it is. If you go and buy a packet of batteries or something that has a sheer fill number, you need a hammer. That's what my client manufactures. I will not let my opinion of that be any way influenced by it. With regard to the matter before the Court, I have essentially three points that I'd like to make. First is that in a non-ambiguous fully integrated contract, the course of performance may not be considered in interpreting the contract or determining the intent of the parties at the time of making the contract. Secondly, with respect to the opinion of the District Court, it is our opinion that the District Court erred in connection with reviewing extrinsic evidence and determining the intent of the parties and the meaning of the price provisions of the contract. The third one is with respect to where you have a non-ambiguous contract that is fully integrated. The Court may consider the conduct or the prior negotiations of the parties leading up to the final contract and determining the meaning of the contract and the intent of the parties. Why isn't Section 4 ambiguous? Or why isn't the interpretation of your opponent a better interpretation than yours? Because Section 4 of the contract, and we have to read the entire contract or the entire provisions as a whole. We can't just pick and choose one sentence over another within the contract. We have to read it so that it makes some sense in its entirety. But Section 4, if you break it down, the only reference to the formula for the making of the price is this concept of the CDI, which is a monthly index used in the industry, minus a specific discount reference of 16.75 cents. The rest of the language, the next three sentences relate to the definition or clarification or explanation of what is the CDI and what would happen if CDI ceases to exist or if there is some material change within the market that requires the parties to negotiate. So that those sections that come after the formula, getting down to the sixth sentence, which talks about without limiting the foregoing, is clear that without limiting the foregoing, the ability for the parties to continue to negotiate or deal with each other in the event in the marketplace something occurs to CDI that without limiting that ability, the fact that everybody knows as of August of 03 that there's going to be a non-market 8 cent change in CDI, which we were told by SHMTECH, that that would not affect the price. Looking at that language, not affect the price, you have to determine, well, what is the price within the meaning of Section 4? The price is CDI minus 16.75%. Where else in that paragraph are you going to find reference to the formula that the parties need to rely upon to determine what the price is? And so the last sentence in Section 4 just says that this will not affect the price. Will not affect the price. And that should be, in your view, that's the end of story and it should be, it's unambiguous and the court should have come out the other way. That's exactly right. I don't think there's any, there's no disagreement between PMC and SHMTECH and apparently the court below. But I guess, let the record reflect, I'm smiling when I said you have two interpretations, both of which each of you say is a reasonable interpretation that has taken you well over hundreds of pages, couple hundred pages to try to explain to us and yet you both say it's not ambiguous. I think the court can very easily and quickly go to what happened in this case with regard to the parties' conduct. First of all, the reference by the court below with regard to what happened after the contract was entered into after January of 04, I think is the red herring in this case, because you cannot take pride of course of performance. If you take a look at three items, and I think we can say this in a memorandum, if you take a look at the initial proposal by SHMTECH, which specifically states that SHMTECH's new proposal, and there's a double asterisk, and it says that SHMTECH's proposal is CDI minus 16.75%. And this is done in August of 03 at a time when there is a contract that goes to December of 03. And that particular double asterisk says that everybody should be aware that in January, CDI is going to be, CDI has announced in June of 03, that coming in the following January, there's going to be a non-market change of 8 cents. In that double asterisk, it says that the discount level, not CDI, the discount level will change accordingly. The next document that SHMTECH produces is their call report, and Mr. Vinarchuk and Mr. Buklowski report back to SHMTECH management, and they say exactly the same thing. There's going to be a change in CDI, we told the people at PMC that this is going to happen, and that if that happens, there's going to be an adjustment to the discount. And then if we look at the draft of the contract, which comes several weeks later, which is taking the contract then in existence, and they cut and paste it a little bit, they strike out terms, and they say there's an asterisk that says that when the change occurs, there's going to be an appropriate adjustment to the discount. All of that, those three items, do not find their way into the contract that SHMTECH prepared. The contract that is before the court is, as Judge Siric indicated with the last language in paragraph 6, without limiting the foregoing. The price will not change. The price is CDI less 16.75. Correct. Correct. That's what section 4 says, you hope. I hope. That's your reasonable That is my reasonable argument, and I think that with regard to looking at this contract, this contract has been prepared by SHMTECH. It is You're negotiating, what you've just gone through, and you emphasize it in your brief as well you should, because if you get to negotiations and the execution of the contract, you've got some pretty strong arguments to be made. The meet and release clause request that was denied, and the 100% supply contract, that was what this was all about. And the different But don't get there. And your friends across the aisle haven't really addressed that in their brief, so I'm waiting to ask them that question. I think the court also has to put it in the context of the parties themselves. I mean, this is somewhat of an unusual case in that during the course of the 03 contract, when the dispute was ongoing, and the litigation was ongoing, these parties get together and they negotiate another contract. The other thing that I think the court needs to focus on, although it's not necessarily a contractual matter, but as the lower court indicated, as everybody agrees in this case, when PMC was told by SHMTECH, you know, the price here is eight cents less than what you thought, as we presented, we continue to pay the price that SHMTECH said they believe was the correct interpretation of the contract. I must say to this court, that in the many years that I haven't engaged in the practice of law, that oftentimes you'll see either party trying to use the distinction or the interpretation of the contract as leverage. PMC did not. PMC said, okay, we want to go before the court, we want to go to a neutral party and have an opportunity. That's all well and good. This is a heck of a mistake that was made. Your interpretation is a $3 million mistake. Absolutely, Your Honor. It's one way or the other. It's in this court language that suggests to the court, as the court is aware that given the scope of review, that it's a de novo review, the court has the opportunity to take a look at this record and determine on its own whether or not, given the facts and the record of this case, that is this CDI minus 16.75, is the paragraph four clearly states? Can we consider the fact that the 2005 contract is 17.75? Is that a fact that we can consider to determine the intent of the parties in the 2003 contract? No. Because you have it in your brief. I do have it in my brief, because it's part of the overall relationship for this party. The fact of the matter is that would be contrary to my argument about course of performance. In determining what happens in 05 to the 03 contract, you can't just... You mean I can't beat up on you on that? No, you can't, Your Honor. I give up on that. Okay. I'll give up on it. The final thing, I think the case is straightforward. I think this court has to determine by its own interpretation based upon the record of this case, what did the parties intend? And I would simply focus the court on the events that occurred on August 3rd of 2003, what the parties understood, what we were told by Shuntech, and the fact that we always relied upon Shuntech to tell us the price, because we were not a subscriber to CDI. They had to tell us, and monthly, the CDI index would change. It's exactly like the prime rate. Prime rate goes up and down. It fluctuates monthly. The only thing that is known is that the prime rate or the CDI changes. We want to fix price off of that. It's CDI minus 16.75 cents. It's the prime rate plus or minus 1%. I believe our brief, clearly and succinctly and in a reply brief, sets forth our position, unless the court has any further questions. Good. Anything else? Good. Mr. Sullivan, thank you very much. Mr. Wall. Thank you, Your Honor. My name is Mike Wall. I represent the Appalachian Tech, Inc., along with Krista Muro and Lisa Glasband, who are here today. Shuntech is asking the court to affirm the trial court's determination below. And I want to address two points, primarily. One is the course of dealing issue, and then secondly is the interpretation issue. I'll was that Judge Wilson considered course of conduct to interpret the contract. And number one, I don't think that's the case. I think Judge Wolfson was clear in her opinion that she did not consider extrinsic evidence, and she said that. And I think that's dispositive of the issue. But I obviously have to go on. And if she considered it, it was a reversible error. And there are two reasons. Number one is, you can construe this contract in a reasonable way, the way Shuntech says, from just looking at the four corners. And we'll come to that in a minute. Secondly, course of performance is always admissible in a UCC case. And there is, I need to walk the court through a couple of cases that they cite in their reply brief, because we didn't have a chance to argue them after that. Good. Don't stray too far from the microphone, because we get you on tape here. Good. Yes, Your Honor. Pardon. Because the cases that they cite do not stand for the propositions for which they cited them before. First, Your Honor, there are two cases, Beijing Metals and Cherokee Water, that they cite for the proposition that you can't consider course of performance. Neither of those cases are UCC cases, and you have to take those out. What is the course of performance you're talking about here? The fact that they paid for those X number of months at the lower, at the higher rate? It's that and more, Your Honor. Part of the course of performance is, they actually calculated the price themselves. Why would that be your first issue? I would think the first issue you would want us to consider is, how is this contract interpreted? How is Section 4? What is your reasonable interpretation? That's what I would think. Yes, Your Honor. If I can just delay for one second on that, I really want to get rid of these cases, because they have miscited the law of the court. And that is this. The three cases they cite, Krupp, New Bremen, and Bob Robertson, are all cases that don't deal with course of performance. What they deal with is adding additional terms. And under Section 2208 or Section 1103, that's a completely different concept. Section 2208 and Section 1103 of the Texas UCC plainly say, you can always consider course of performance to understand the terms of the parties' agreements. It is black-letter law, and they just flat-out miscited that. So I'm going to get to the interpretation issue. Your Honor, in taking into account what you can do to construe the contract, one of the things you've got to take into account are the business realities. What's going on? This is commodity pricing. PVC, the little resin that looks like salt that their product is made from, is a commodity. It's sold just like salt or flour or anything else in huge bulk. The price doesn't differ, and this is all on the record, the price doesn't differ very much from manufacturer to manufacturer. It is, and as Mr. Mason said in his affidavit, and they don't worry about it, it is unheard of to have a price that is eight cents below what the competitive price is in the marketplace. And that is what their argument is. So their interpretation doesn't fit with commercially what was going on. Also, what was going on in the marketplace was... What if it's 100% output contract? What if they have a 100% supply agreement? Yeah. Your Honor, that doesn't make any difference. That has benefits for both parties. We have a customer who's going to buy 100% of their supply, and they know that they're assured of getting all their product from us. That doesn't enter into it. The price is not going to be materially different, and certainly not eight cents different because of that particular term. But if the price they're paying you is so high that it's interfering with the profitability of their company, and if there's another seller out there who says, we will give you this product at 10 cents less a pound, if they've got a 100% contract with you, they're stuck. They can't go get that. And yet, if they feel that the price you are charging is impinging on their profitability as they negotiate new contracts, if they can't get out of 100%, aren't they going to make sure that the price they pay is more competitive than perhaps what they had been paying? Maybe not more competitive, Your Honor, but certainly competitive. And it brings up the issue of the price of resin. They were losing money. They were losing money not because of the price of resin. They were losing money, as they said in their papers, because they couldn't pass their cost along to their customers. That's what their issue was. And they used this... Well, isn't the price of resin one of the reasons they can't pass the cost on to their customers? Yes, Your Honor. Yes, Your Honor. It certainly is. It is the single biggest cost that they have. And they watch every half penny to make sure that they get the very best deal. So that, if we can consider the circumstances surrounding the negotiation and execution of the contract, one can understand why the words were used here. We can certainly understand from our point of view, Your Honor. Well, from both points of view. Yeah, I would respectfully disagree. The double asterisk, the single asterisk, the rejection of the meet and release clause, the whole course of negotiation and execution shows that they were very interested in every half penny, as you said. As we were, Your Honor. We were equally interested, because our business is based on half pennies also. Well, then let me ask you a question. Under your interpretation of Section 4, the discount drops to 8.75 cents per pound, right? The overall price drops by 8 cents. Well, the discount would be. Yeah, CDI less 8 cents less the discount of 8.75. That's your interpretation. But 8.75 isn't even mentioned in Section 4. It's only implicit. So that to accept your interpretation, we have to make explicit something that is not explicit, correct? Because there's no mention of 8.75 in the section. That is simply the mathematical product of 16 and three quarters less 8 cents. But what is explicit is the price is CDI less 16.75. And Your Honor, if the Section 4 stopped at that point, I wouldn't have flown up to Pennsylvania to make this argument. But if Section 4 stopped at sentence five, same thing. I mean, you would have renegotiated. You would have done something in anticipation of a non-market adjustment. But you have a sentence six. Yes, Your Honor. And that says, you know what it says. That says, without limiting the foregoing, the non-market change of 8 cents per pound adjustment to CDI, et cetera, et cetera, will not affect the price. And the price in sentence one is CDI less 16.75. Tell me why that's not the reasonable reading of Section 4. I think, and I will explain this. I think the simple reason is that reads out much of what is contained in Section 4.  No, it doesn't. Because of the last sentence. I think the plaintiff, the appellant, argues that the sentences two, three, and four deal with unforeseen events, which is correct. And the last sentence deals with the foreseen event of the non-market adjustment of 8 cents. Your Honor, if I can address those points. First, in paragraph four, line six, where it says that the price will not be affected, it's not talking about the pricing mechanism. Pricing mechanism is CDI minus 16. Well, it also says the price is CDI minus 16.75. Yes, Your Honor. Qualified by what is, what remains in the paragraph. And one very important thing is paragraph, excuse me, sentence five, which says, if there is ever this market change, which they had defined, this is a market change. Non-market change. Non-market change, excuse me. We're going to get back to an index that is the same as CDI. If that's where it ended, I would agree with you. And I'm not prejudging it here. I just, but it went one sentence further. And it said the price shall not change with the non-market adjustment of 8 cents. Yes, Your Honor, but it said something before it said that that is key. And that is where it says without limiting the foregoing. What is not limited? We have to answer that question. This is not ambiguous. Don't forget, this is not an ambiguous. It's not ambiguous because what, what is, excuse me, what is the foregoing part? It's at least the paragraph five where, excuse me, sentence five, where you have to get back to a price that is consistent with CDI as of the day. So this, these words of limitation without limiting the foregoing says that that sentence is subordinate to what goes before it. And what goes before it is you always get back to a price neutral CDI index. And that's, that's, that's what they read out. That's why their interpretation is completely unreasonable because they read out without limiting the foregoing. You know, the district court said that the 8% adjustment was intended to have a neutral effect on the price. I still don't understand why if it was to have a neutral effect on the price, the price would not remain CDI minus 1675. Yes, Your Honor. And I can understand that. I can clear it up. In section five, they're talking about we're going to change the price mechanism if this event occurs. We'll change the price mechanism so that it's going to be consistent with CDI as of the day hereof. That's the price mechanism. Okay. And sentence five had appeared in all the earlier contracts. That's correct, Your Honor. Any unexpected change that may come along, we'll negotiate. That's right. But sentence six is dealing with an expected change, a change the parties had talked about, a change that has been reflected in earlier drafts. And so knowing that that was going to happen, they don't need to just say an unexpected change. They can negotiate and deal with the expected change and saying, notwithstanding what we need for unexpected changes, we've dealt with this. And they did, Your Honor. And how they did that was they put these words in that said without limiting, going back to something that's price neutral, without limiting it. So they said we're going to go back to something that's price neutral. They then in paragraph, excuse me, sentence six says what's happening is a non-market change. That triggers a price neutral negotiation. They said it's a change in methodology. That also triggers a price neutral negotiation. What they said this is not going to affect is the price. The only reasonable interpretation of what the price is, that's what they paid. But you don't need an interpretation of what the price is because the price is defined in the first sentence. Well, Your Honor, that would then read out five, which says if this event occurs, then you have to go back to something that's price neutral. No, it said if some unexpected event occurs, we will negotiate. But sentence six deals with an expected event. Your Honor, if that had been the case, if that was the interpretation of what the parties meant, they wouldn't have said without limiting before going. Yes, they would. Yes, they would. They say we're not dealing with something unexpected. This is something new. We won't be bound by sentence five. Sentence five's been in all the contracts. We don't need to worry about that because we've already decided this issue. Your Honor, that is contrary, exactly contrary, 180 degrees from what they wrote. I don't think so. Not the way I read the plain meaning of the language of that paragraph. I cannot read without limiting before going, which is the price neutral negotiation. It says we're not going to limit that. This is what they're talking about. We know this event's coming. No, without limiting the foregoing means, without in any way impinging upon the negotiations that might occur under sentence five if there is some unexpected change, dealing with the expected change, this is what we're doing. If that is what they were trying to do, I think they would have said it a little bit differently. And they would have said down here that it won't affect the pricing mechanism, CDI minus 16.75. Instead they said it's not going to change the price. And the ordinary meaning of that is if you're paying 35 cents in December before this change, you're going to pay the same. The price is not going to be affected, and you will pay the same come that change. Your Honor, one other thing I want to point out is in grappling with what the price means here, if you look at the sentence that follows, it says the price here under is net delivered. That's not CDI minus 16.75. That is the price that occurs. That's how much they're actually paying. That also confirms that what they're talking about in sentence six is where it says it will not affect the price, which is the price that they were paying. Explain that to me. I don't follow that. Why does net delivered mean that? I'm not sure that I understand your argument. Why does net delivered mean the CDI? The sentence six is not talking about the pricing mechanism. It's talking about the price actually being paid by PMC. That price in December was 35 cents. The price that was paid in January was 35 cents plus a 2-cent market adjustment. I think that the word price is used in sentence six where it says will not affect the price. It's the same as it's used in seven. It means the price that they were actually paying. That's what they were trying to do. If they're not trying to say come January, we're going to give you an 8-cent. I think that's apples and oranges. That's why I say, well, you're going to put a stamp on the envelope. I mean, this isn't the kind of price we're talking about. This is like who's going to pay postage. I don't think, well, that's speaking only. I didn't see that argument developed in your brief in any event. No, Your Honor, we didn't develop that. It just helps to understand what that word price is. Okay. Any other questions? Okay. Mr. Wall, thank you very much. I mean, I'm sorry, Mr. Sullivan. Briefly, Your Honor, just four points. First, with regard to the comments concerning the cases that we cited in our reply brief not being accurate in that they're not UCC cases, although this case comes within the context of the Uniform Commercial Code, we're not here arguing the provisions of the Uniform Commercial Code. We're not talking about recovery or cover or anything of that nature. We're talking about a simple contract case. So the provisions relating to contract law apply. Secondly, in terms of what Mr. Wall said— No, no. You cannot look at course of performance. No, but if we do, your position is that that helps your position. To the extent that we, as we indicate in our memorandums, in our papers, the course of performance, we understood we had a 100% supply contract. We could not do anything other than continue to pay the price that Shintec required us to pay. So that course of performance wasn't conscious. It was conscious in that we had to pay because of our contractual obligations, which we were bound in good faith. Well, you could have checked the CDI. You could have checked the invoice. We did not have access to CDI. That's the problem here. I don't understand that. I would think that— CDI is a subscriber— Yeah, but a telephone call would answer that question, wouldn't it? I think, Your Honor, if you take a look at this case and you see all of the attempts that have been made to make everything confidential and the confidentiality provisions that were entered into, Shintec views the CDI as almost a state secret. And we did not subscribe to CDI, and CDI was given to us each month by Shintec. So we had no access to CDI. They were the ones that told us. And under our contract, they would tell us that our entire four contracts up to this point, we relied upon CDI. And when Mr. Wall talked about you need to know what is going on, that's incorrect. If you look at the negotiations of the parties with respect to what was going on at that time, that's why the contract reads what it reads. Of course, the dispute here isn't what the CDI was. The dispute is how much is deducted from the CDI. Correct. And that is exactly set forth in paragraph 4. And the only thing is 16.75%. I'd like to wrap up quickly, Your Honor, in terms of if this court determines in its de novo review that there is an ambiguity, then that ambiguity has to be held against Shintec because they drafted the contract. Lastly, I'd ask this court to overrule the district court and find that summary judgment should have been entered in favor of PMC Canada. Thank you, Your Honor. Good. Any other questions? Good. Mr. Sullivan, thank you. The case was very well argued. We will take the matter under advisement.